**ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**
G. Mark Albright, Nevada Bar No. 1394
801 S. Rancho Dr., Suite D4
Las Vegas, NV 89106
Telephone: (702) 384-7111
Facsimile: (702) 384-0605
E-mail: gma@albrightstoddard.com

**FARUQI & FARUQI, LLP**
Stuart J. Guber (*pro hac vice forthcoming*)
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
Telephone: 215-277-5770
Facsimile: 215-277-5771
Email: sguber@faruqilaw.com

Nina M. Varindani (*pro hac vice forthcoming*)
685 Third Avenue, 26th Floor
New York, New York 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: nvarindani@faruqilaw.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| VALERIE KLUGE, Derivatively on Behalf of Nominal Defendant, ZOOMPASS HOLDINGS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> ROBERT LEE, STEVEN ROBERTS, EDWARD (TED) YEW, JON TONDEUR and BRIAN MORALES, <br><br> Defendants, <br><br> and <br><br> ZOOMPASS HOLDINGS, INC. <br><br> Nominal Defendant. | Case No.: <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Valerie Kluge ("Plaintiff"), by and through her undersigned attorneys, submits this Verified Shareholder Derivative Complaint (the "Derivative Complaint") against defendants named herein. Plaintiff's information and belief is based upon, among other things, the investigation conducted by and under the supervision of her counsel which included, among other things: (a) a review and analysis of regulatory filings filed by Zoompass Holdings, Inc. ("Zoompass" or the "Company") with the United States Securities and Exchange Commission ("SEC") and other state and federal regulatory agencies; (b) a review and analysis of press releases and media reports issued and disseminated by Zoompass; (c) a review of other publicly available information concerning Zoompass and other entities, including articles in the news media and analyst reports; (d) complaints and related materials in litigation commenced against some or all of the Individual Defendants and/or the Company, including, but not limited to, the securities class action litigation filed against the Company and Defendants Robert Lee and Brian Morales in the United States District Court for the District of New Jersey ("Securities Class Action")[1]; and (e) applicable rules and regulations.

## SUMMARY OF THE ACTION

1.    This is a shareholder's derivative action brought for the benefit of Nominal Defendant Zoompass. Zoompass is a Nevada corporation that maintains its principal place of business in Toronto, Canada. Zoompass shares trade on the Over the Counter Market under the ticker "ZPAS." Zoompass was formerly known as UVIC, Inc. ("UVIC"). UVIC was incorporated in Nevada on August 21, 2013. On August 22, 2016, UVIC entered into an agreement for an exchange of stock with Zoompass, Inc., an Ontario, Canada corporation, pursuant to which UVIC agreed to issue 8,060,913 shares of its restricted common stock to Zoompass, Inc. shareholders in exchange for all of the shares of Zoompass, Inc. As a result, Zoompass, Inc. became a wholly owned subsidiary of UVIC, and UVIC subsequently amended its articles of incorporation to change its name to Zoompass Holdings, Inc.

---

[1] *Naymish Patel et al v. Zoompass Holdings, Inc. et al.*, Docket No. 2:17-cv-03831 (D.N.J. May 30, 2017).

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

2.     Zoompass is a financial platform provider with divisions in physical prepaid cards, financing enablement, and mobility products.  The Company provides businesses and government solutions to help digitize their financial transactions.  Zoompass offers program management services for prepaid and virtual card accounts and mobile technology which enables businesses to provide their customers with a white label mobile wallet.  The Company's prepaid programs include gift cards, incentive cards, check replacement cards and online and mobile virtual card account programs.

3.     Throughout the Relevant Period, the Individual Defendants (defined below) caused Zoompass to engage in an illicit stock promotion scheme for the purpose of artificially inflating the value of Zoompass shares so that the Individual Defendants could capitalize on their significant equity awards, which they improperly awarded to themselves.

4.     On May 9, 2017, the Company issued a press release announcing that on May 8, 2017, the OTC Markets Group, Inc. had informed the Company about certain "promotional activity concerning ZPAS stock." In the May 9, 2017 press release, the Company falsely claimed that it was unaware of the effect of the promotional activity, if any, on trading activity involving ZPAS shares, and unequivocally denied having any involvement in the stock promotion scheme or any affiliation with the promoters.

5.     Then, on May 11, 2017, the Company issued another press release announcing that the OTC Markets Group, Inc. had listed ZPAS common stock on its OTC Pink Current Information, rather than on the OTCQB, and had placed the Caveat Emptor symbol on Zoompass's profile as a result of the promotional activities disclosed in the Company's May 9, 2017 press release.  The May 11, 2017 press release, again, falsely implied that the Company had no knowledge or involvement in the illicit stock promotion scheme and advised the investing public that Zoompass's public disclosures were accurate and complete.

6.     Following the May 9, 2017 and May 11, 2017 press releases, Zoompass's stock fell $1.67, or more than 45%, over a three-day period, from $3.64 on May 9, 2017 to close at $1.97 per share on May 12, 2017, on unusually heavy trading volume.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

7.      Then, on May 25, 2017, the Fraud Research Institute ("FRI") published an article on Seeking Alpha entitled "Zoompass Holdings: Buyer Beware" (the "Seeking Alpha Article"), exposing the illegal stock promotion scheme and the true extent of the Individual Defendants' fraudulent conduct[2]. The Seeking Alpha Article alleged that: (i) Zoompass shares are inflated due, in part, to an ongoing stock promotion campaign; (ii) the Company's original corporate name (UVIC, Inc.) appears in an SEC subpoena related to questionable registration statements; (iii) OTCMarkets.com has already designated the stock as "Caveat Emptor" a/k/a Buyer Beware; and (iv) Defendant Robert Lee ("Lee"), Chief Executive Officer ("CEO") and director of Zoompass, has failed to disclose his relationship with Pura Naturals, Inc. ("Pura"), another promoted penny stock.

8.      Notably, the Seeking Alpha Article questioned the Company's market cap of over $117 million, given that the Company's annual report on Form 10-K filed with the SEC on April 24, 2017 (the "2016 10-K") disclosed that Zoompass has generated gross revenues totaling $284,345 and has incurred net losses totaling almost $14 million.

9.      Indeed, in the Company's short history as reflected in its SEC filings to date, Zoompass admits that it "has not achieved profitability to date." Further, the financial statements confirm that the Company has received a "going concern" audit opinion since inception.

10.      Yet, despite the Company's deteriorating financial condition and negative cash flow, the Individual Defendants have continuously awarded themselves excessive compensation, the majority of which was comprised of stock purchase options, warrants and deferred stock units, where the Individual Defendants could only secure a profit if the market price per share of the Company's stock increased considerably. Further, the Individual Defendants had a financial motive to maintain the artificially inflated price of the Company's stock price while the unvested portion of the equity compensation, including the stock purchase options, vested over time. Thus, the Individual Defendants, who collectively are the beneficial owners of 62.7% of the Company's outstanding

---

[2] https://seekingalpha.com/article/4076519-zoompass-holdings-buyer-beware (last visited September 25, 2017).

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

common stock[3], had an overwhelming financial motive to increase and maintain the stock price per share as high as possible for as long as possible, in order to cash in those options and other equity awards as they vested.

11.    Additionally, certain of the Individual Defendants engaged in self-dealing by entering into and/or approving related party transactions between the Company and certain of the Individual Defendants. As discussed below, effective August 22, 2016, the Company assumed agreements that covers fees paid to companies owned and controlled by Defendants Lee, Edward (Ted) Yew ("Yew") and Brian Morales ("Morales"). Additionally, the Company's SEC filings state that during 2016, the Company paid an advance on behalf of certain directors and officers of the Company in the amount of $250,000.

12.    As admitted by the Company, the Board of Directors (the "Board") does not have any standing committees and accordingly, the entire Board is responsible for overseeing and performing all functions that would customarily be assigned to a Board committee, including, but not limited to, reviewing and approving related party transactions entered into between the Company and certain of the Individual Defendants. To date, the Individual Defendants have failed to disclose the terms of the contractual arrangements or the advance that they themselves approved and benefited from. Because certain of the Individual Defendants stand on both sides of the agreements, they are conflicted and are unable to independently and/or disinterestedly consider a demand challenging the fairness of the agreements.

13.    In addition to the fact that the Individual Defendants are not disinterested given that they have rewarded themselves with excessive compensation and have caused the Company to enter into related party transactions with certain of the Individual Defendants, Plaintiff has not made a demand upon the Board to take action to rectify the misconduct alleged herein as the majority of the Board is not independent. The Board currently consists of four directors, three of which also serve

---

[3] As stated by the Company in the 2016 10-K, all officers and directors as a group beneficially own 62.7% of the Company's outstanding common stock. Yet, the sum of the percentage of shares owned by Defendants Lee (38.1%), Edward (Ted) Yew (12.2%), Steve Roberts (1.4%) and Jon Tondeur (3.2%) equals a total of 54.9%, a difference of 7.8%. The Company has not provided any information about this discrepancy.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

as officers of Zoompass.  In fact, the Company admits in the 2016 10-K that "[o]nly Mr. John Tondeur was deemed to be an 'independent director', as that term is defined by the listing standards of the national exchanges and SEC rules."  Thus, any demand made on the Board to take action is futile.

14.    The Individual Defendants breached their fiduciary duties by: (i) approving and/or causing the Company to engage in an illicit stock promotion scheme for the purpose of inflating the price of Zoompass shares so that the Individual Defendants could profit from their significant equity holdings; (ii) engaging in self-dealing by entering into and/or approving related party transactions entered into between the Company and certain of the Individual Defendants, each of which is subject to an entire fairness standard; (iii) awarding themselves excessive and lavish compensation, despite the Company's precarious financial condition; and (iv) making and/or causing the Company to make false and misleading statements and/or failing to disclose that: (a) the Company engaged in an illegal stock promotion scheme which resulted in the artificial inflation of Zoompass shares; (b) discovery of the foregoing conduct would subject Zoompass to potential criminal sanctions and heightened regulatory scrutiny; and (c) as a result of the foregoing, the Company lacked adequate internal controls over financial reporting.

## JURISDICTION AND VENUE

1.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  There is complete diversity among the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

2.    This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contact with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

3.    Further, this Court has specific personal jurisdiction over each Defendant pursuant to Nev. Rev. Stat. § 78.135(1), which (i) "provides notice to [corporate] officers and directors that they are subject to derivative suits for violation of their authority," (ii) "provides [them] the understanding that by violating their authority as a Nevada corporation's officer or director, they are subject to an

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

action under Nevada's laws in Nevada," and (iii) "supports a district court's authority to exercise personal jurisdiction over officers and directors in such lawsuits." *See Consipio Holding, BV v. Carlberg*, 282 P.3d 751, 756 (Nev. 2012). Additionally, by purposefully engaging in acts that have caused direct harm to Zoompass, a Nevada corporation, the Defendants have established contacts with Nevada and have "affirmatively direct[ed] conduct" toward Nevada. *Id.*

4.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because one or more of the defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including defendants' primary participation in the wrongful acts detailed herein and aiding in violation of fiduciary duties owed to Zoompass occurred in this District and defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that have an effect in this District.

## PARTIES

5.      Plaintiff Valerie Kluge ("Plaintiff") is currently and has continuously been a stockholder of Zoompass throughout the Relevant Period. Plaintiff is a resident of New Jersey.

*Zoompass*

6.      Nominal Defendant Zoompass is incorporated under the laws of the state of Nevada and maintains its principal place of business at 107 Atlantic Avenue, Suite 201, Toronto, Ontario M6K1Y2. According to the Company's SEC filings, Zoompass was formerly known as UVIC. UVIC was incorporated in Nevada on August 21, 2013. On August 22, 2016, UVIC entered into an agreement for an exchange of stock with Zoompass, Inc., an Ontario, Canada corporation, pursuant to which UVIC agreed to issue 8,060,913 shares of its restricted common stock to Zoompass, Inc. shareholders in exchange for all of the shares of Zoompass, Inc. As a result, Zoompass, Inc. became a wholly owned subsidiary of UVIC, and UVIC subsequently amended its articles of incorporation to change its name to Zoompass Holdings, Inc.

7.      Zoompass is a financial platform provider with divisions in physical prepaid cards, financing enablement, and mobility products. The Company provides businesses and government solutions to help digitize their financial transactions. Zoompass offers program management services

7

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

for prepaid and virtual card accounts and mobile technology which enables businesses to provide their customers with a white label mobile wallet. The Company's prepaid programs include gift cards, incentive cards, check replacement cards and online and mobile virtual card account programs.

8. Zoompass's common stock trades on the Over-the-Counter ("OTC") Marketplace under the ticker symbol "ZPAS".

***Robert Lee***

9. Defendant Robert Lee ("Lee") has served as a director and the Chief Executive Officer ("CEO") of Zoompass since August 2016. Lee has also served as a director of Pura Naturals, Inc. ("Pura") since April 2016, and as a director and CEO of Paymobile, Inc. ("Paymobile"), a Florida corporation, since 2014. Pursuant to the Company's Annual Report filed on Form 10-K with the SEC on April 24, 2017 (the "2016 10-K"), as of April 18, 2017, Lee was the beneficial owner of 15,210,668 shares of Zoompass common stock, which represents 38.1% of the Company's issued and outstanding shares. Further, according to the 2016 10-K, for the fiscal year ended December 31, 2016, defendant Lee earned and/or received $349,923 in total compensation, consisting of $101,312 in salary, $74,131 in deferred stock units and $174,480 in option awards.

10. The 2016 10-K also disclosed that in November 2016, the Company's Board of Directors approved and the majority of shareholders consented to the adoption of an equity based compensation plan. On December 1, 2016, Zoompass issued 1,480,000 common stock purchase options at an exercise price of CAD $1.50 (approximately $1.23 USD) to the Company's directors, officers, employees and consultants. Of the 1,480,000 common stock purchase options, 562,500 vested immediately and are exercisable for five years from the grant date, and 917,500 of the options are exercisable for five years from the grant date and vest ratably over a three-year period from the date of grant. As of December 31, 2016, Defendant Lee was awarded 537,500 stock options, 197,222 of which were exercisable as of that date.

11. Further, the 2016 10-K also stated that on December 1, 2016, the Company issued 460,000 deferred stock units to directors, officers, employees and consultants of the Company, which had a life of five years from the date of the grant. Of the deferred stock units, 187,500 vested

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

immediately and were required to be exercised by the recipient, and settlement of the deferred stock unit may be in cash or common stock of the Company at the option of the Company. As of December 31, 2016, Defendant Lee was awarded 162,500 deferred stock units, 65,278 of which vested immediately.

12.     Additionally, in the 2016 10-K, the Company states that "[e]ffective August 22, 2016, the [Company] assumed an agreement that covers fees paid to a company owned and controlled by Rob Lee.  The agreement calls for payment of Cdn$22,000 [USD $18,040] per month plus the reimbursement of expenses incurred on the Company's behalf.  As at December 31, 2016, the fees noted above remain unpaid."  To date, the Company has not publicly disclosed any substantive information about the terms of the foregoing contractual arrangement with the entity owned by Defendant Lee. Upon information and belief, Lee is a citizen of Canada.

***Steven Roberts***

13.     Defendant Steven Roberts ("Roberts") has served as a director and President of Zoompass since August 2016.  Pursuant to the 2016 10-K, as of April 18, 2017, Roberts was the beneficial owner of 574,497 shares of Zoompass common stock, representing 1.4% of the Company's issued and outstanding shares.  Further, according to the 2016 10-K, for the fiscal year ended December 31, 2016, defendant Roberts earned and/or received $284,032 in total compensation, consisting of $35,421 in salary, $74,131 in deferred stock units and $174,480 in option awards.  As of December 31, 2016, Defendant Roberts was awarded 537,500 stock options, 197,222 of which were exercisable as of that date, and 162,500 deferred stock units, 65,278 of which were immediately exercisable as of that date.  Upon information and belief, Roberts is a citizen of Canada.

***Edward (Ted) Yew***

14.     Defendant Edward (Ted) Yew ("Yew") has served as a director and Secretary of Zoompass since August 2016.  Yew has also served as a director of Paymobile since 2014.  Yew previously served as Chief Financial Officer ("CFO") of Paymobile in 2014 and currently serves as the Secretary of Paylocity.   Yew previously served as CEO of Rockex Mining Corporation

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

("Rockex") from 2012 until 2015[4].  According to the 2016 10-K, as of April 18, 2017, Yew was the beneficial owner of 4,875,997 shares of Zoompass common stock, representing 12.2% of the Company's issued and outstanding shares.  Further, according to the 2016 10-K, for the fiscal year ended December 31, 2016, defendant Yew earned and/or received $53,165 in total compensation, consisting of $53,165 in salary.

15.     Additionally, in the 2016 10-K, the Company states that "[e]ffective August 22, 2016, the [Company] assumed an agreement that covers fees paid to a company owned and controlled by Edward Yew.  The agreement calls for payment of $14,000 per month plus the reimbursement of expenses incurred on the Company's behalf.  Fees to this Company were ceased on October 1, 2016.  As at December 31, 2016, the fees above remain unpaid.  To date, the Company has not publicly disclosed any substantive information about the terms of the foregoing contractual arrangement with the entity owned by Defendant Yew.  Upon information and belief, Yew is a citizen of Canada.

*Jon Tondeur*

16.     Defendant Jon Tondeur ("Tondeur") has served as a director of Zoompass since August 2016.  Tondeur currently serves as a director of Rockex.  According to the 2016 10-K, as of April 18, 2017, Tondeur was the beneficial owner of 1,279,999 shares of Zoompass common stock, representing 3.2% of the Company's issued and outstanding shares.  Further, according to the 2016 10-K, for the fiscal year ended December 31, 2016, defendant Tondeur earned and/or received $237,009 in total compensation, consisting of $71,108 in deferred stock units and $165,991 in option awards.  As of December 31, 2016, Defendant Tondeur was awarded 187,500 stock options, all of which were exercisable as of that date, and 62,500 deferred stock units, all of which of which were immediately exercisable as of that date.  Additionally, on November 30, 2016, the Company issued 400,000 common share purchase warrants to Tondeur with an exercise price of CAD $0.50 (approximately USD $0.40), each of which is exercisable into one share of the Company's common stock until October 31, 2017.  Upon information and belief, Tondeur is a citizen of Canada.

---

[4] http://www.rockexmining.com/s/NewsReleases.asp?ReportID=532477;
http://www.rockexmining.com/s/NewsReleases.asp?ReportID=698030&_Type=News-Releases&_Title=Rockex-Mining-Appoints-New-CEO. (last visited September 25, 2017).

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

*Brian Morales*

17.    Defendant Brian Morales ("Morales") has served as CFO of Zoompass since August 2016.  He is also a CPA, and has most recently served as CFO and Corporate secretary of several publicly listed mining exploration development companies from 2010 to 2016, including companies which are or were listed on the TSX Venture Exchange, the Toronto Stock Exchange, the OTCQX and the AIM.  According to the 2016 10-K, for the fiscal year ended December 31, 2016, defendant Morales earned and/or received $45,646 in total compensation, consisting of $39,802 in salary, $1,751 in deferred stock units and $4,093 in option awards.  As of December 31, 2016, Defendant Morales was awarded 168,750 stock options, 4,688 of which were exercisable as of that date, and 56,250 deferred stock units, 1,563 of which were immediately exercisable as of that date.

18.    Additionally, in the 2016 10-K, the Company states that "[f]or 2016, fees were paid to a Company owned and controlled by Brian Morales for the time incurred.  As at December 31, 2016, $32,221 remains unpaid."   To date, the Company has not publicly disclosed any substantive information about the terms of the foregoing contractual arrangement with the entity owned by Defendant Morales.  Upon information and belief, Morales is a citizen of Canada.

19.    Defendants Lee, Roberts, Yew and Tondeur are sometimes collectively referred to as the "Current Director Defendants."

20.    Defendants Lee, Roberts, Yew, Tondeur and Morales are sometimes collectively referred to herein as  the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

21.    By reason of their positions as officers, directors and/or fiduciaries of Zoompass and because of their ability to control the business and corporate affairs of  the Company, the Individual Defendants owed Zoompass and its shareholders fiduciary obligations of  care, good faith, loyalty and candor, and were and are required to use their utmost ability to control  and manage the Company in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Zoompass and its  shareholders so as to benefit all shareholders equally and not in furtherance of their personal  interest or benefit.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

22.     Each director and officer of the Company owes to Zoompass and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company's affairs and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

23.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Zoompass, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

24.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Zoompass were required to, among other things:

      a.    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

      b.    Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal, state and foreign laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

      c.    Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

      d.    Exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

25.     Additionally, as admitted by the Company in the 2016 10-K, the Board does not have any standing committees.  Accordingly, the entire Board is responsible for overseeing and performing all functions that would customarily be assigned to a Board committee:

**Committees of Board of Directors**

There are currently no committees of the Board of Directors. Our board of directors is of the view that it is appropriate for us not to have a standing nominating, audit or compensation committee because the current size of our board of directors does not facilitate the establishment of a separate committee. ***Our board of directors has performed, and will perform adequately, the functions of any specific committee.***

(Emphasis added).

26.     Further, the 2016 10-K states that the Board is responsible for overseeing all aspects of risk:

**Board Oversight of Risk**

Our Board of Directors recognizes that, although risk management is a primary responsibility of the Company's management, the Board plays a critical role in oversight of risk. The Board, in order to more specifically carry out this responsibility, has assigned certain task focusing on reviewing different areas including strategic, operational, financial and reporting, compensation, compliance, corporate governance and other risks to the relevant Board Committees as summarized above. Each Committee then reports to the full Board ensuring the Board's full involvement in carrying out its responsibility for risk management.

27.     The Current Director Defendants breached their duties of care, loyalty and good faith by allowing defendants to cause or by themselves causing the Company to enter into an illegal stock promotion scheme for the purpose of artificially inflating the value of Zoompass shares so that the Individual Defendants could capitalize on their significant equity awards, which they improperly awarded to themselves.  At the same time the Current Director Defendants have rewarded themselves and the other Individual Defendants with excessive compensation, the Company has failed to generate any revenues whatsoever from inception to date and has received a "going concern" audit opinion since inception. According to the 2016 10-K, the Company states that "[f]rom the inception of Zoompass, Inc. to December 31, 2016, the Company, inclusive of the results of UVIC Inc., from

13

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

August 22, 2016, generated a net loss of $13,984,951.  Included in the loss was an amount of $12,915,010 related to share-based payments, a non-cash item."  Further, the Company admits that it "has not achieved profitability to date."  Moreover, the repeated issuance of equity and/or debt for share based compensation, services rendered and raising of capital has caused a substantial dilution of existing shareholder ownership stakes, including Plaintiff's.

## SUBSTANTIVE ALLEGATIONS

**Background**

28.     Zoompass was formed through a reverse merger between UVIC, Inc. and Zoompass, Inc.  As discussed above, on August 22, 2016, UVIC entered into an agreement for an exchange of stock with Zoompass, Inc., an Ontario, Canada corporation, pursuant to which UVIC agreed to issue 8,060,913 shares of its restricted common stock to Zoompass, Inc. shareholders in exchange for all of the shares of Zoompass, Inc.  As a result, Zoompass, Inc. became a wholly owned subsidiary of UVIC, and UVIC subsequently amended its articles of incorporation to change its name to Zoompass Holdings, Inc.

29.     Zoompass is a financial platform provider with divisions in physical prepaid cards, financing enablement, and mobility products.  The Company provides businesses and government solutions to help digitize their financial transactions.  Zoompass offers program management services for prepaid and virtual card accounts and mobile technology which enables businesses to provide their customers with a white label mobile wallet.  The Company's prepaid programs include gift cards, incentive cards, check replacement cards and online and mobile virtual card account programs.

30.     On September 6, 2016, the Company filed a current report on Form 8-K with the SEC discussing the Stock Purchase Agreement and announcing the Company's new management team, which consisted of the Individual Defendants.  The Form 8-K further stated that the Company will "amend its Articles of Incorporation to change its name to Zoompass Holdings, Inc. and file the appropriate forms with FINRA and the SEC to change its name, address, symbol and complete a 3:5-1 forward [stock] split."

1       31.    Additionally, the Form 8-K falsely stated that "there are no related party transactions

2 reportable under Item 5.02 of Form 8-K and Item 404(a) of Regulation S-K."  The foregoing

3 statements were materially false and misleading as the Company failed to disclose that: (i) effective

4 August 22, 2016, the Company assumed an agreement that covered fees paid to a Company owned

5 and controlled by Defendant Lee, which called for payment of Cdn$22,000 per month plus

6 reimbursement of expenses incurred on the Company's behalf; (ii) effective August 22, 2016, the

7 Company assumed an agreement that covered fees paid to a Company owned and controlled by

8 Defendant Lew, which called for payment of $14,000 per month plus reimbursement of expenses

9 incurred on the Company's behalf; and (iii) for 2016, the Company paid fees to a company owned

10 and controlled by Brian Morales for the time incurred.

11       32.    On November 18, 2016, the Company filed a Current Report on Form 8-K with the

12 SEC announcing that on November 10, 2016, the Company's board of directors "dismissed AJSH &

13 Co. LLP ("AJSH") as the independent registered public accounting firm of UVIC, Inc."  The Form

14 8-K went on to state the following, in relevant part:

15           AJSH's report on the financial statements for the fiscal year ended December 31, 2015
and 2014, contained no adverse opinion or disclaimer of opinion, and were not

16           qualified or modified as to uncertainty, audit scope or accounting principle, other than
an explanatory paragraph as to a going concern.

17

18           During the fiscal the fiscal year ended December 31, 2015 and 2014, and in the
subsequent interim period through November 10, 2016, the date of termination of

19           AJSH, (a) there were no disagreements with Anton on any matter of accounting
principles or practices, financial statement disclosure or auditing scope or procedure,

20           which disagreements, if not resolved to the satisfaction of AJSH, would have caused
them to make reference to the subject matter of the disagreements in its reports on the

21           financial statements for such year and (b) there were no reportable events as defined

22           in Item 304(a)(1)(v) of Regulation S-K.

23           ***We have provided a copy of the above disclosures to AJSH on November 10, 2016
and requested AJSH to provide it with a letter addressed to the U.S. Securities and***

24           ***Exchange Commission stating whether or not AJSH agrees with the above***

25           ***disclosures.  As of the date of this filing, AJSH has not provided a responsive letter.***

26 (Emphasis added).

27

28

15

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

33.     Item 304(a)(3) states that "the registrant shall request the former accountant to furnish the registrant with a letter addressed to the Commission stating whether it agrees with the statements made by the registrant in response to this Item 304(a) and, if not, stating the respects in which it does not agree. The registrant *shall file the former accountant's letter as an exhibit to the report on registration statement containing this disclosure.* If the former accountant's letter is unavailable at the time of filing such report or registration statement, then the registrant shall request the former accountant to provide the letter as promptly as possible so that the registrant can file the letter with the Commission within ten business days after the filing of the report or registration statement" (emphasis added). Despite the Company's statement that it requested ASJH to provide the Company with a letter addressed to the SEC and being legally required to file a copy of the letter with the SEC, the Company has yet to file ASJH's letter with the SEC, in direct violation of Item 304(a)(3).

34.     The November 18, 2016 Form 8-K further disclosed that "[o]n November 10, 2016, [Zoompass's] board of directors approved the engagement of MNP, LLP ('MNP') as the Company's new independent registered public accounting firm."

35.     On November 21, 2016, the Company filed a current report on Form 8-K with the SEC announcing that on September 7, 2016, the Company "obtained written consent by the holder of the majority of the voting power of the Company's capital stock approving amendments to the Company's Articles of Incorporation to (1) change the Company's name to Zoompass Holdings, Inc. and (2) approve a forward stock split at a ratio of 3.5-for-1, and (3) increase the authorized shares of common stock to 500,000,000." The Company stated that it had filed Articles of Amendment with the Secretary of State of Nevada, which will become effective upon compliance with the notification requirements of the Financial Industry Regulatory Authority ("FINRA").

**The Individual Defendants Have a History of Making False and Misleading Statements and Concealing Material Information**

36.     On April 24, 2017, the Company filed the 2016 10-K with the SEC disclosing the Company's financial results for the fiscal year ended December 31, 2016. According to the 2016 10-K, "[f]rom the inception of Zoompass, Inc. to December 31, 2016, the Company, inclusive of the

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1   results of UVIC Inc., from August 22, 2016, generated a net loss of $13,984,951. Included in the loss

2   was an amount of $12,915,010 related to share-based payments, a non-cash item."

3          37.    Additionally, the 2016 10-K stated that there are currently "no committees of the

4   Board of Directors" and that the Board "has performed, and will perform adequately, the functions of

5   any specific committee:"

**Committees of Board of Directors**

There are currently no committees of the Board of Directors. Our board of directors is of the view that it is appropriate for us not to have a standing nominating, audit or compensation committee because the current size of our board of directors does not facilitate the establishment of a separate committee. ***Our board of directors has performed, and will perform adequately, the functions of any specific committee.***

**Board Oversight of Risk**

Our Board of Directors recognizes that, although risk management is a primary responsibility of the Company's management, the Board plays a critical role in oversight of risk. The Board, in order to more specifically carry out this responsibility, has assigned certain task focusing on reviewing different areas including strategic, operational, financial and reporting, compensation, compliance, corporate governance and other risks to the relevant Board Committees as summarized above. Each Committee then reports to the full Board ensuring the Board's full involvement in carrying out its responsibility for risk management.

17         38.    In other words, given that there are no standing committees of the Board, the Current

18  Director Defendants are responsible for overseeing all aspects of Zoompass's corporate governance,

19  including, but not limited to, determining the amount and frequency of compensation to be awarded

20  to themselves and the review and approval of related party transactions entered into by the Company

21  with entities owned and/or controlled by certain of the Individual Defendants.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

39.   Also included in the 2016 10-K was the following chart, which shows the amount of shares beneficially owned by the directors and officers of the Company:

| Title of Class | Name of Beneficial Owner | Office, if any | Amount of shares controlled | Percent of class[1] |
|---|---|---|---|---|
| Common Stock | Rob Lee | Chief Executive Officer and Director | 15,210,668 | 38.1% |
| Common Stock | Ted Yew | Secretary and Director | 4,875,997 | 12.2% |
| Common Stock | Steve Roberts | President and Director | 574,497 | 1.4% |
| Common Stock | Jon Tondeur | Director | 1,279,999 | 3.2% |
| Common | All officers and directors as a group | | | 62.7% |
| Common Stock | Mississaugas of the New Credit | | 3,000,000 | 7.5% |

(1)  Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities

40.   Based on the foregoing chart, the Company states that all officers and directors as a group beneficially own 62.7% of the Company's outstanding common stock. Yet, the sum of the percentage of shares owned by Defendants Lee (38.1%), Edward (Ted) Yew (12.2%), Steve Roberts (1.4%) and Jon Tondeur (3.2%) equals a total of 54.9%, a difference of 7.8%. The Company has not provided an explanation for this discrepancy.

41.   The 2016 10-K also provided a summary of the Company's related party transactions but critically omitted the terms of the contractual arrangements between the Company and certain of the Individual Defendants:

**NOTE 9– RELATED PARTY TRANSACTIONS AND BALANCES**

During the period, the Company paid an advance on behalf of certain shareholders in the amount of $250,000. These shareholders also serve as directors and officers of the Company. $120,000 was returned by December 31, 2016, and $50,000 was returned subsequent to December 31, 2016. The $130,000 is reflected in prepaids and other current assets as at December 31, 2016. Of the amount advanced currently $80,000 remains outstanding.

***The total amount owing to the same shareholders, in relation to the services they provide to the Company in their capacity as Officers for the period ended December 31, 2016 was $186,818 which includes expense reimbursements.*** This amount is reflected in accounts payable and is further described below.

As at December 31, 2016, the Company had an amount owing to an entity owned and controlled by the Chief Executive Officer of the Company of $127,073. The amount

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

owing relates to services provided by the Chief Executive Officer and expense reimbursements.

As at December 31, 2016, the Company had an amount owing to an entity owned and controlled by the Secretary of the Company of $59,745. The amount owing relates to services provided by the Secretary and expense reimbursements.

As at December 31, 2016, the Company had an amount owing to the President of the Company of $28,092 for salary.

As at December 31, 2016, the Company had an amount owing to an entity owned and controlled by the Chief Financial Officer of the Company of $31,653. The amount owing relates to services provided by the Chief Financial Officer.

A total of $2,868,702 was recognized during the period ended December 31, 2016, for share-based payments expense to directors and officers of the Company.

As at December 31, 2016, the amounts owing to officers of the Company are recorded in Accounts payable and accrued liabilities.

As previously noted in note 3, in June 2016, the Company had acquired certain net assets from a shareholder of Zoompass.

(Emphasis added).

42.    In other words, the 2016 10-K states that the Company owed a total of $186,818 to its officers for services provided by the officers for the period ended December 31, 2016. Yet, as also listed above, a totaling of the individual amounts owed to Defendants Lee ($127,073), Yew ($59,745), Roberts ($28,092) and Morales ($31,653) equates to $246,563, a difference of $59,745.    The Company has failed to provide an explanation for this discrepancy.

43.    Further, the 2016 10-K falsely stated that the Company "did not have any promoters at any time during the past fiscal five years:"

**Promoters and Certain Control Persons**

***We did not have any promoters at any time during the past five fiscal years.***

Our executive officers and directors from time to time may serve on the board of directors executive officers of other companies. However, none of our executive officer or directors serve as executive officers or directors or on the compensation committee of another company that has any executive officer serving on our Board of Directors (or Board of Directors acting as the Compensation Committee).

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

No person who served on our Board of Directors (or Board of Directors acting as the Compensation Committee) had any relationship requiring disclosure under Item 404 of Regulation S-K.

(Emphasis added).

44.     The 2016 10-K also contained a report by MNP LLP, the Company's independent registered public accounting firm at the time, which stated the following, in relevant part:

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Zoompass Holdings, Inc., as of December 31, 2016, and the consolidated results of its operations and its cash flows for the period from the date of incorporation to December 31, 2016, in conformity with accounting principles generally accepted in the United States of America.

> The accompanying consolidated financial statements have been prepared assuming that the Company will continue as a going concern. As discussed in Note 1 to the consolidated financial statements, ***the Company has incurred losses from operations and is dependent upon future sources of equity or debt financing in order to fund its operations. These conditions raise substantial doubt about the Company's ability to continue as a going concern.*** Management's plans regarding those matters are also described in Note 1. The consolidated financial statements do not include any adjustments that might result from the outcome of this uncertainty.

(Emphasis added).

45.     In the Sarbanes-Oxley ("SOX") Certifications accompanying the 2016 10-K, Defendants Lee and Morales each certified that they are "responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant to have:

> a)     "Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared";

> b)     "Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision,

20

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;" [and]

c)   "Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation."

46.   Further, the SOX certifications stated that Defendants Lee and Morales "have disclosed, based on [Defendants Lee and Morales'] most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)   all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)   any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

47.   The statements in the preceding paragraphs were false and misleading because the Individual Defendants made and/or caused the Company to make false and misleading statements and/or failed to disclose that: (i) the Company engaged in an illegal stock promotion scheme which resulted in the artificial inflation of Zoompass shares; (ii) discovery of the foregoing conduct would subject Zoompass to potential criminal sanctions and heightened regulatory scrutiny; and (iii) as a result of the foregoing, the Company lacked adequate internal controls over financial reporting.

**Certain Defendants Cause Zoompass to Misrepresent and/or Conceal Material Information**

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

48.     On May 8, 2017, the Company issued a vague press release briefly disclosing an update about the Company's business and information objectives going forward.  The press release stated the following, in relevant part:

> TORONTO, ONTARIO--(Marketwired - May 8, 2017) - Zoompass Holdings Inc. ("Zoompass" or the "Company") (ZPAS) is pleased to announce the following update on the Company's business and information objectives going forward.
>
> The Company is pleased to announce that through an existing sales agent agreement, it expects to receive commissions through an initial purchase order under the program for delivery of mobility products of just over 6,000 units. Additionally, the Company is also pleased to announce that through a separate agency agreement it expects to receive commissions through a commitment of 5,000 wireless routers over a 12 month period.
>
> In a separate transaction, Zoompass has delivered 50,000 prepaid cards through its distribution partner to select retail locations as a result of satisfactory demand from the initial program launch. Additionally, the Company is pleased to announce that it has invoiced for a unique new program for a national consumer brand with an initial commitment of just over 50,000 cards, which is envisioned to utilize the Company's financial platform.
>
> Steve Roberts, President, commented, *"We are extremely delighted in the advancement of our mobility products solutions and believe the Company is well positioned to take advantage of seasonally stronger sales in the second half of the year. We are also extremely pleased with the developments on the prepaid cards solutions and look forward to the additional revenues generated from the additional prepaid cards entering into the marketplace."*

49.     On May 9, 2017, the Company issued a press release issuing a statement about promotional activity concerning Zoompass's common stock and denying any involvement by the Company and its directors and officers in the stock promotion scheme.  The press release stated the following, in relevant part:

> TORONTO, ONTARIO--(Marketwired - May 9, 2017) - Zoompass Holdings Inc. ("Zoompass" or the "Company") (ZPAS) announces that it has been made aware of and requested by the OTC Markets Group, Inc. to comment on recent trading and potential promotional activity concerning ZPAS common stock.
>
> On May 8, 2017, OTC Markets informed the Company that it became aware of a promotional newsletter touting the Company and encouraging investors to purchase the Company's common stock. ***The Company is unaware of the effect on the trading activity, if any***, as the Company had previously issued over the preceding several

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

weeks press releases and SEC reports outlining, among other things, more complete and robust descriptions of the Company's business and opportunities, the entry into certain agreements in furtherance of the Company's disclosed business plans, and consummation of private placements with respect to the sale of non-registered shares in the common stock of the Company necessary to effect the business plan. During which time the Company's common stock, and volume of trading, rose at a steady and robust rate. Following the Company's forward stock split approved in mid-February of this year, the public announcements thereof shortly thereafter, and DWAC approval from the DTC in the middle of March, the Company's stock began trading actively in late-March. *The Company is unaware of the full nature and content of the promotional newsletter and any related promotional activity, the responsible parties and the extent of the email newsletters' dissemination.*

*The Company is not aware of the promotional materials' author or its affiliated entities or persons, other than the identifying information disclosed in the newsletter. The Company's recent press releases have reported on and provided disclosure of legitimate and ongoing corporate activity only, and are not part of any promotional activities or campaign.* "While we support the rights of investors and market participants to publicly comment on our stock and the market generally, the Company encourages those interested in the Company to rely solely on information included in its press releases combined with its filings and disclosures made with OTCMarkets Group and the Securities and Exchange Commission, which is available on the SEC's website. We thank OTCMarkets for their openness and consideration to the investors of Zoompass Holdings, Inc. and will continue to support the open and complete disclosure of information regarding the Company" commented Mr. Brian Morales, Chief Financial Officer of the Company.

After inquiry, *the Company states definitively that its officers, directors and, to the Company's knowledge, its controlling shareholders (i.e., shareholders owning 10% or more of the Company's securities), of which there are only two, have not, directly or indirectly, authorized or been involved in any way (including payment to a third-party) with the creation or distribution of promotional materials including the subject newsletter; and that the Company, its officers, directors and, to the knowledge of the Company, any controlling shareholders, have not sold or purchased the Company's securities within the past 90 days on the open market. Additionally, the shares currently held by the Company's officers, directors and controlling shareholders are not registered.*

Despite a statement in the promotional material that the author has spoken to management of the Company, the Officers, Directors and the controlling shareholders definitively state that there has been no contact with the author of the material. Further, the promotional material asserts that a $30 million dollar investment was given to the Company. This is not the case rather the Company has stated in the past that prior owners of the platform had invested over CDN$40 million in the technology.

In June of 2016, the Company engaged and continues to engage Smashbox Consulting Inc., a digital consulting firm to assist the Company in product and application marketing and brand awareness to new and existing customers. Other than this marketing consultant, *the Company has engaged no third parties to provide*

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1   *marketing services and has engaged no third parties to provide investor relations*
*services, public relations services, or other related services.*

2   (Emphasis added).

3       50.     Then, on May 11, 2017, the Company issued another press release announcing that the

4   OTC Markets Group, Inc. had listed ZPAS common stock on its OTC Pink Current Information,

5   rather than on the OTCQB, and had placed the Caveat Emptor symbol on Zoompass's profile as a

6   result of the promotional activities disclosed in the Company's May 9, 2017 press release.  The May

7   11, 2017 press release stated the following, in relevant part:

8       TORONTO, ONTARIO--(Marketwired - May 11, 2017) - Zoompass Holdings Inc.
("Zoompass" or the "Company") (ZPAS) announces that the OTC Markets Group, Inc.

9       has listed ZPAS common stock on its OTC Pink Current Information, rather than on
the OTCQB, and placed the Caveat Emptor symbol on the company profile as a result

10      of the promotional activities that was disclosed in our Press Release dated May 9,
2017. As a matter of policy, when it has come to the attention of OTC Markets that a

11      security has been the subject of promotional activities, OTC Markets may at its
discretion label a security "Caveat Emptor." Promotional activities may include

12      newsletters, whether they are published by the company or a third party, as was the
case here.

13

14      We note that the Caveat Emptor sign **does not mean or imply** that any public
information made available by the Company is inaccurate, incomplete or insufficient

15      in any way, and is not an opinion or suggestion by the OTC Markets or the Company
regarding the price of the Company's common stock. *We assure the public that all of*

16      *our press releases, SEC filings and information on our website*
*(www.zoompass.com) and the OTC markets profile remains true, correct and*

17      *complete.* We encourage anyone considering an investment in our securities to review
our public filings, website and press releases and to not rely on third party

18      newsletters/recommendations or general stock symbols/classifications or other
identifiers regarding our securities, whether positive or negative, as these items are

19      simply opinions/policies of a third party and should not be a substitute for investors'
research and independent decision making process.

20

21      "The Company supports the OTC Markets' policy regarding promotional activities,"
stated Rob Lee, Chief Executive Officer of Zoompass Holdings, Inc., *"but we also*

22      *strongly believe that our public disclosures are accurate and complete, and that they*
*fully describe our commitment to our business plan and our progress in effectuating*

23      *our business plan. We believe that any increased market interest in our securities in*
*recent weeks is the result of those efforts and disclosures, and not materially related*

24      *to any newsletters that may have been distributed by third parties.* Our investors are
encouraged to do their own research and not to rely on third parties, and we believe

25      that our public filings and our website make it very easy for investors and potential
new investors to do just that." The Caveat Emptor symbol will remain on the Company

26

27

28

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1   profile until OTC Markets Group believes there is no longer a public interest concern,
and we will work with OTC Markets diligently on that front.

2

3   (Emphasis added).

4       51.     Following the May 9, 2017 and May 11, 2017 press releases, Zoompass's stock fell

5   $1.67, or more than 45%, over a three-day period, from $3.64 on May 9, 2017 to close at $1.97 per

6   share on May 12, 2017, on unusually heavy trading volume.

7       52.     On May 15, 2017, the Company issued a press release announcing its financial results

8   for the first quarter ended March 31, 2017.  The press release stated the following, in relevant part:

9   TORONTO, ONTARIO--(Marketwired - May 15, 2017) - Zoompass Holdings Inc.
    ("Zoompass" or the "Company") (ZPAS) announces that it has filed its 10-Q report
10  with the SEC for the period ended March 31, 2017. During the period the Company
    reported net revenue of $254,683, gross margin of $37,659 *and a net loss of $635,168*
11  or $0.02 per share. Included in the net loss for the period was $104,722 related to non-
    cash expenses.
12
    The Company was extremely pleased to report a positive trend in net revenue which
13  was up 191% in the first quarter of 2017, compared with the net revenue for the quarter
    ended December 31, 2016 and 290% compared with the quarter ended September 30,
14  2016. The Company believes that the increasing trend in net revenue was a result of
    the Company's efforts to gaining traction in the Company's prepaid card solutions as
15  well as revenue from the launch of the Company's mobility solutions. The Company
    believes that additional traction from the mobility solutions, the launch of the
16  Company's Mobile Money Platform and the business from the previously announced
    agreements should continue to drive the Company's results for the months ahead.
17
    Rob Lee, Chief Executive Officer of the Company, commented, *"We are extremely*
18  *pleased with the direction the Company is headed and believe it is a direct result of*
    *the efforts of Zoompass' employees and business partners. We believe the launch of*
19  *our new revenue pillars, the continued traction across our existing revenue pillars, as*
    *well as potential synergies across our financial solutions offerings, will have a positive*
20  *impact on the Company's results and ultimately shareholder value."*
21

22

23  (Emphasis added).

24      53.     That same day, the Company filed a quarterly report on Form 10-Q with the SEC

25  reiterating its financial results for the quarter ended March 31, 2017 (the "2017 1Q 10-Q").

26  Additionally, the 2017 1Q 10-Q summarized the various related party transactions entered into by the

27  Company with certain of the Individual Defendants, and stated the following, in relevant part:

28

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**NOTE 9– RELATED PARTY TRANSACTIONS AND BALANCES**

During 2016, the Company paid an advance on behalf of certain shareholders in the amount of $250,000. These shareholders also serve as directors and officers of the Company. $120,000 was returned by December 31, 2016, and $50,000 was returned during the period ended March 31, 2017. The $80,000 is reflected in prepaids and other current assets as at March 31, 2017 (December 31, 2016 - $130,000).

The total amount owing to the same shareholders, in relation to the services they provide to the Company in their capacity as Officers at March 31, 2017 was $211,205 (December 31, 2016 - $186,818) which includes expense reimbursements. This amount is reflected in accounts payable and is further described below.

As at March 31, 2017, the Company had an amount owing to an entity owned and controlled by the Chief Executive Officer of the Company of $156,769 (December 31, 2016 - $127,073). The amount owing relates to services provided by the Chief Executive Officer and expense reimbursements.

As at December 31, 2016, the Company had an amount owing to an entity owned and controlled by the Secretary of the Company of $54,436 (December 31, 2016 - $59,745). The amount owing relates to services provided by the Secretary and expense reimbursements.

As at March 31, 2017, the Company had an amount owing to the President of the Company of $26,086 (December 31, 2016 - $28,092) for salary.

As at March 31, 2017, the Company had an amount owing to an entity owned and controlled by the Chief Financial Officer of the Company of $25,470 (December 31, 2016 - $31,653). The amount owing relates to services provided by the Chief Financial Officer.

A total of $79,735 was recognized during the period ended March 31, 2017, for share-based payments expense to directors and officers of the Company.

As at March 31, 2017 and December 31, 2016, the amounts owing to officers of the Company are recorded in accounts payable and accrued liabilities.

54.     The 2017 1Q 10-Q states that as of March 31, 2017, the Company owed a total of $211,205 to its officers for services provided. Yet, as also listed above, a totaling of the individual amounts owed to Defendants Lee ($156,769), Yew ($54,436), Roberts ($26,086) and Morales ($25,470) equates to $262,761, a difference of $51,556. The Company has failed to provide an explanation for this discrepancy.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

55.     Notably, the 2017 1Q 10-Q failed to disclose any substantive information about the material terms of the foregoing contractual arrangements, let alone the agreements themselves. The omitted information concerning the terms of the contractual arrangements with certain of the Individual Defendants, all of which were reviewed and/or approved by the Current Director Defendants, was material to investors. Further, because the Individual Defendants beneficially own approximately 62.7% of Zoompass's outstanding stock and thus, are majority shareholders of the Company, the foregoing contractual arrangements evidence self-dealing and are required to meet the entire fairness threshold.

56.     Additionally, in the SOX Certifications accompanying the 2017 1Q 10-Q, Defendants Lee and Morales each certified that they are "responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant to have:

   a)   "Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared";

   b)   "Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;" [and]

   c)   "Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation."

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

57.     Further, the SOX certifications stated that Defendants Lee and Morales "have disclosed, based on [Defendants Lee and Morales'] most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

     a)    all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

     b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

58.     The statements in the preceding paragraphs were false and misleading because the Individual Defendants made and/or caused the Company to make false and misleading statements and/or failed to disclose that: (i) the Company engaged in an illegal stock promotion scheme which resulted in the artificial inflation of Zoompass shares; (ii) discovery of the foregoing conduct would subject Zoompass to potential criminal sanctions and heightened regulatory scrutiny; and (iii) as a result of the foregoing, the Company lacked adequate internal controls over financial reporting.

**Seeking Alpha Publishes an Explosive Report Exposing the Illegal Stock Promotion Scheme and Raising Questions about the Company's Business and Operations**

59.     On May 25, 2017, the Fraud Research Institute ("FRI") published an article on Seeking Alpha entitled "Zoompass Holdings: Buyer Beware" (the "Seeking Alpha Article"), exposing the illegal stock promotion scheme and the true extent of the Individual Defendants' fraudulent conduct[5]. The Seeking Alpha Article alleged that: (i) Zoompass shares are inflated due, in part, to an ongoing stock promotion campaign; (ii) the Company's original corporate name (UVIC, Inc.) appears in an SEC subpoena related to questionable registration statements; (iii) OTCMarkets.com has already

---

[5] https://seekingalpha.com/article/4076519-zoompass-holdings-buyer-beware

28

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

designated the stock as "Caveat Emptor" a/k/a Buyer Beware; and (iv) Defendant Lee has failed to disclose his relationship with another promoted penny stock.

60.     The Seeking Alpha Article questioned the Company's market cap of over $117 million, given that the 2016 10-K disclosed that Zoompass has generated gross revenues totaling $284,345 and has incurred net losses totaling almost $14 million:

**Company Profile**

Zoompass is a financial services company that provides businesses with solutions to help digitize financial transactions. The company offers prepaid debit cards, member reward systems and an electronic payment platform that enables businesses to provide their customers with a white label mobile wallet.

According to the company's most recent annual report, from the date of incorporation through December 31, 2016, it has generated gross revenues totaling $284,345 and has incurred net losses totaling almost $14 million.

Despite the company boasting an increase in net revenues to just $254,683 in the most recent quarter ending March 31, 2017, and announcing an expectation to receive commissions in an undisclosed amount related to a purchase order with an undisclosed third party, it currently trades with a market cap of over $117,000,000, based on 39,680,731 shares outstanding as of April 21, 2017, and a share price of $2.95.

Shares of Zoompass have increased from about $1.50 per share to as high as $3.75 per share during the past three months with trading volume increasing significantly. Although difficult to prove, *we believe that the main contributor to the stock's recent performance is not the company's recent results but rather an ongoing stock promotion campaign.*

(Emphasis added).

61.     Additionally, the Seeking Alpha Article referenced several of the Company's press releases, claiming that the press releases "lack substance" and "fail to reference any specific material numbers that could justify the recent increase in market cap to nearly $117 million:"

**Recent Company Announcements**

Below we have listed all of the company's announcements made during the past several months. In our opinion, *although these press releases occasionally sound upbeat, they fail to reference any specific material numbers that could justify the recent increase in market cap to nearly $117 million:*

- Zoompass Virtual Card Program Enables Latin American (LATAM) Consumers Access To US E-Commerce Markets - *5/24/2017*

29

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

- Zoompass Files First Quarter Results - *5/15/2017*

- Zoompass Issues Statement About Its Common Stock OTC Market Listing - *5/11/2017*

- Zoompass Issues Statement About Promotional Activity Concerning Its Common Stock - *5/9/2017*

- Zoompass Announces Corporate Update - *5/8/2017*

- Zoompass Selects UVend Group of Companies as Self Serve Kiosk and Digital Partner - *4/27/2017*

- Zoompass Corporate Update - *4/18/2017*

- Zoompass Provides Operational and Corporate Update - *3/3/2017*

In our opinion, the company's press releases above lack substance. For example, in the company's operational and corporate update, it referenced agreements with SYNNEX Canada Limited, SKY Devices LLC and U-Vend Group, but failed to mention specific terms and conditions.

(Emphasis added).

62. The Seeking Alpha Article referenced a "glaring report" by Editor Rick Currin touting Zoompass's business and operations and revealing that a third-party, Sargon Finance SA, paid almost $2 million to "promote shares of the ZPAS stock to unsuspecting buyers:"

**Volatility Attributed To Stock Promotion**

To date, we have discovered advertisements on Google and Yahoo Finance that direct visitors to a website promoting Zoompass here.

In true promotional form, the website features a glaring report by Editor Rick Currin that is quick to point out industry statistics and million dollar figures relating to "financial technology" while lacking substance relating to the company's internal business operations.

However, the most important dollar amount is buried within the legal disclaimer:

30

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

> This online report is a solicitation for subscriptions for the newsletter and a paid promotional advertisement of Zoompass (ZPAS). Zoompass (ZPAS) was chosen to be profiled after Currin Technology completed due diligence on Zoompass (ZPAS). Currin Technology expects to generate new subscriber revenue, the amount of which is unknown at this time, resulting from the distribution of this report. While receiving no direct compensation, and maintaining absolutely no obligation to provide any future views in support of the company highlighted, Currin Technology will receive indirect marketing support consistent with distribution of the report and will likely acquire new subscribers, the amount of which is not known at this time. <u>Sargon Finance SA paid One Million Nine Hundred Ninety-Eight Thousand Two Hundred Sixty Dollars for the creation of various elements of this campaign in an effort to build investor awareness.</u>

> ***The website is actually a tout sheet whereby a third party (Sargon Finance SA) paid almost $2 million "to build investor awareness," or in other words to promote shares of the ZPAS stock to unsuspecting buyers.***

> It is our opinion that the recent run-up in Zoompass is primarily attributed to this nearly $2 million stock promotion campaign. As we have described in past reports, shares of heavily promoted stocks like Zoompass are temporarily inflated during the promotional campaign and almost always crash in the short term.

> We have found the smoking gun evidence linking Zoompass to another heavily promoted stock, Pura Naturals, Inc. (OTCQB:PNAT), and believe that the two stocks will behave similarly. Specifically, we believe that shares of ZPAS will decline by 50-70% from prevailing market prices similar to the way Pura Naturals traded when its stock promotion campaign topped out.

(Emphasis added).

63.     The Seeking Alpha Article went on to discuss the similarities between Zoompass and Pura Naturals, including but not limited to, the "nearly identical promotional campaigns" engaged in by the two companies:

> **Zoompass & Pura Naturals: Nearly Identical Promotional Campaigns**

> ***Zoompass and Pura Naturals have been the subject to promotional campaigns that are so similar in nature that we believe it is not unreasonable to anticipate the two stocks behaving similarly, at least in the short term. For Zoompass, this could mean a sharp decline of more than 50% in the short term.***

> Below we have outlined three of the most brazen similarities between the two stock promotion campaigns:

> *1. Creative Direct Marketing Group*

> Creative Direct Marketing Group is an advertising and digital marketing agency located in Southern California that appears to be at least partially responsible for the

31

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

investor awareness ad campaigns targeting both Zoompass Holdings, Inc. and Pura Naturals, Inc.

In addition to the similar website layouts and domain names used for both the Zoompass stock promotion (Zoompassinvestor.com) and Pura Naturals stock promotion (Purainvestor.com), you can find direct evidence connecting Creative Direct Marketing Group to both stock promotion advertisements.

(**UPDATE 6/30/2017 4:35 p.m.:** Representatives of Creative Direct Marketing Group have provided Seeking Alpha with the following statement:

*"The article previously published was inaccurate in its implication and statements. CDMG has never been paid or hired by ZoomPass Holdings or Pura Naturals. These entities have never been clients of CDMG. CDMG is an advertising and marketing agency that specializes in paid subscription newsletters and subscriber acquisition, helping such diverse newsletters as Standard + Poor, Dow theory forecast and Vectorvest. While investment newsletter publisher clients have recommended and written about ZoomPass Holdings and Pura Naturals, CDMG has no control over what they recommend."*)

When you sign up to receive Rick Currin's email newsletter from the Zoompass promotional website, you will notice the originating sender of Rick Currin's email alerts is "mkt@theinvestmentstrategy":

Rick Currin <mkt@theinvestmentstrategy.com> Unsubscribe                    Apr 28
to me

# Zoompass' (OTC: ZPAS) Disruptive Mobile Technology Could Help You Turn Every $5,000 Invested into $18,475 – or More!

A search of ICANN's WHOIS database reveals that the owner of the "theinvestmentstrategy.com" domain name is Craig Huey, president of the Creative Direct Marketing Group:

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

*Showing results for: THEINVESTMENTSTRATEGY.COM*
Original Query: theinvestmentstrategy.com

## Contact Information

| Registrant Contact | Admin Contact | Tech Contact |
|---|---|---|
| Name: CRAIG HUEY | Name: CRAIG HUEY | Name: CRAIG HUEY |
| Organization: CDMG INC. | Organization: CDMG INC. | Organization: CDMG INC. |
| Mailing Address: 21171 S WESTERN AVE, TORRANCE CA 90501 US | Mailing Address: 21171 S WESTERN AVE, TORRANCE CA 90501 US | Mailing Address: 21171 S WESTERN AVE, TORRANCE CA 90501 US |
| Phone: +1.3102125727 | Phone: +1.3102125727 | Phone: +1.3102125727 |
| Ext: | Ext: | Ext: |
| Fax: | Fax: | Fax: |
| Fax Ext: | Fax Ext: | Fax Ext: |
| Email:ACCOUNTING@CDMGINC.COM | Email:ACCOUNTING@CDMGINC.COM | Email:ACCOUNTING@CDMGINC.COM |

Creative Direct Marketing Group actually won an award for "Best Investor Relations Online Campaign" for its work with Pura Naturals, Inc. and the ad agency is referenced in the legal disclaimer of the PNAT promotional website:

The principal owner of World Opportunity Investor, James DiGeorgia, received a $7,500 due diligence fee to analyze and evaluate Pura Naturals, Inc. (NASDAQ OTC: PNAT) and $25,000 spokesperson and editorial fee. Creative Direct Marketing Group, Inc. participated in the creation and dissemination of these materials. This report does not provide a professional analysis of a Pura Naturals, Inc. (NASDAQ OTC: PNAT) financial position.

Coincidentally, both Zoompass Holdings and Pura Naturals were subject to stock promotion campaigns with budgets just shy of $2 million managed at least in part by Creative Direct Marketing Group.

*2. The Denial of Involvement*

On May 9, 2017, Zoompass issued a press release regarding a promotional newsletter touting the company's stock. Compare Zoompass's press release with the one issued by Pura Naturals on January 19, 2017:

- Zoompass Issues Statement About Promotional Activity Concerning Its Common Stock

- Pura Naturals, Inc. Issues Statement About Promotional Activity Concerning Its Common Stock

The two company-issued press releases above have many sections that are almost identical in context with some areas copied verbatim. ***The two most likely explanations for these similar press releases is either plagiarism or a related party being responsible for the authoring of both companies' press releases. Based on all of our other findings, we believe the likelihood of the latter is very high.***

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

*3. The Chart Patterns*

Below is a historical stock chart for Pura Naturals, Inc. for the relevant time period when its stock was subjected to a promotion campaign.



Compare the chart above with the current stock chart for Zoompass and you will notice that to date the charts are nearly identical.

Both stocks were dormant for months and traded at approximately $1.50 per share. Then, all of a sudden, each stock's volume spiked right around the time when promotional newsletter campaigns began surfacing on the Internet. After each stock climbed for about 25 trading days, share prices hit $3.75 and $3.64, respectively. Next, both stocks plummeted by more than 50% before bouncing.

Pura Naturals shares bounced all the way back to $3.45 but failed to break out to new all-time highs. In the 20 trading days that followed, the stock fell by as much as 56%.

Although in the long term each company's stock will be more reflective of the successes or failures of each operating business, in the short term, it is our opinion that the stock chart for Zoompass Holdings is driven more by the current promotional campaign than by internal business operations and company news releases. Since the promotional campaign itself along with the stock chart closely resembles the promotional campaign and stock chart for Pura Naturals, we believe that the two will continue to act similar in the short term. For Zoompass, this could mean an imminent collapse of 56% in the short term.

64.     Finally, the Seeking Alpha Article discussed overlapping management between Zoompass and Pura Naturals, and stated the following:

**Zoompass & Pura Naturals: More Connections Between The Two**

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

In addition to the resemblances between the stock promotion campaigns subjected to Zoompass and Pura Naturals, there are also internal examples that demonstrate how the companies themselves may be connected.

*Robert "Rob" Lee*

Robert "Rob" Lee has maintained the position of chief executive officer and director of Zoompass Holdings, Inc. since August 2016. In addition to previously serving as the president and CEO of a company that eventually went into receivership, Lee has "focused on the financing and restructuring of various private entities":

> Rob Lee, Director and Chief Executive Officer:  Since 2014, Mr. Lee has served as the Chief Executive Officer and Director of a private financial technology company.  He has previously served as the President and CEO of various companies including Versatech Group Inc., a company listed on the NASDAQ and Toronto Stock Exchange up until the late 1990's.  Since that time Mr. Lee has focussed on the financing and restructuring of various private entities in a wide variety of industries including manufacturing, construction, mining and retail.

One career endeavor apparently missing from Robert Lee's bio involves an obscure reference to Lee within a share exchange agreement related to Pura Naturals, Inc. found in a Form 8-K filed on July 26, 2016:

> **Item 1.01 Entry into a Material Definitive Agreement.**
>
> *Share Exchange Agreement*
>
> Effective July 18, 2016 (the "Closing Date"), Yummy Flies, Inc. (the "Company") entered into that certain Share Exchange Agreement (the "Share Exchange Agreement") by and among the Company, Pura Naturals, Inc., a Delaware corporation ("PURA") and certain shareholders of PURA (the "PURA Shareholders").  Pursuant to the Share Exchange Agreement, the Company agreed to exchange the outstanding common and preferred stock of PURA held by the PURA Shareholders for shares of common stock of the Company on approximately a 1:4.2 basis, (after giving effect to certain share cancellations).  <u>At the Closing Date, Robert Lee, the holder of 8,289,000 shares of common stock, agreed to cancelation of such shares.</u>  Other than Robert Lee, shareholders of Company common stock held approximately 1,926,000 shares.  Also on the Closing Date, the Company issued approximately 6,267,000 shares of common stock to the PURA shareholders.  In addition, shares issuable under outstanding options of PURA will be exercisable into shares of common stock of the Company, pursuant to the terms of such instruments.  The shares of PURA common stock issuable upon exercise of options will be exchanged for approximately 470,000 Shares of the Company's common stock, par value $0.001 per share.  As of the date of the filing of this Current Report on Form 8-K, the holders of the majority shares of common of PURA have exchanged their shares into a majority of the shares of the issued and outstanding shares of the Company's common stock.

Although we have been unable to reach a representative of Zoompass to clarify Robert Lee's full involvement with Pura Naturals, Inc., a Reuters company profile page lists Robert Lee as being appointed as a director to Pura Naturals in April 2016:

> Robert Lee    Mr. Robert Lee is a Director of the Company. Mr. Lee was appointed director in April, 2016. Mr. Lee is an experienced manager and has been the CEO of Paymobile, Inc. since 2014. Previously, he was the CEO of Global Connections Mining from 2010-2012, and concurrently the CEO of Northern Supply, Inc. from 2010-2014 and a partner of Tango Wireless from 2010-2011. From 2000-2007, Mr. Lee was the CEO of Versatech Industries.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

In fact, *we believe there is a possibility that Robert Lee may in fact also be the chief executive officer of Pura Natural, Inc. under the name Robert Doherty.*

*Obscure Executive Officer Listed In Zoompass's Annual Report*

**Smoking gun evidence connecting Zoompass to Pura Naturals can be seen on page 24 of ZPAS's most recent Annual Report filed on April 24, 2017. In the list of executive officers section, "Robert Doherty" is listed as director and chief executive officer of Zoompass Holdings:**

As of December 31, 2016, there were four Named Executive Officers are set forth below:

| Name | Position |
|------|----------|
| Robert Doherty | Chief Executive Officer, and Director |
| Steve Roberts | President and Director |
| Edward (Ted) Yew | Secretary and Director |
| Brian Morales | Chief Financial Officer |

Robert Doherty also happens to be listed as the chief executive officer for Pura Naturals, Inc. in the company's most recent Annual Report:

**Directors and Executive Officers**

The following table sets forth the names, ages and positions held with respect to each Director and Executive Officer of the Company as of the date of this Annual Report.

| Name | Age | Position | Director Since |
|------|-----|----------|----------------|
| Robert Doherty | 56 | Chief Executive Officer and Chairperson of the Board | 2016 |
| Robert Switzer | 53 | Corporate Secretary and Director | 2016 |
| James Kordenbrock (1) | 54 | Chief Executive Officer and Director | 2016 |

Either there was a highly unusual typo in the Zoompass annual report that mistakenly listed Pura Naturals CEO as its own *or Robert Lee and Robert Doherty may be the same individual.* According to a Bloomberg biography, the chief executive officer for Zoompass Holdings, Inc. is Robert Doherty Lee.

If Robert Doherty Lee is serving dual roles as both the chief executive officer of Zoompass Holdings, Inc. and Pura Naturals, Inc., we believe that investors should remain highly suspicious of the failure to disclose this relevant information in the SEC filings.

(Emphasis added).

65.    Following the publication of the Seeking Alpha Article, shares of Zoompass fell $0.70, or more than 23% from its previous closing price, to close at $2.25 on May 25, 2017.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**The Individual Defendants Continue to Cause Zoompass to Issue Materially False and Misleading Statements and Omissions**

66.     On May 25, 2017, following the publication of the Seeking Alpha Article, the Company filed an amended annual report on Form 10-K/A with the SEC, amending and restating a portion of Part II, Item 11, under the paragraph entitled "Persons Covered," by changing the name of Zoompass's CEO and Director from Robert Doherty, to Jack Robert Lee ("Rob Lee"). The Company attributed the reason for the change to a "scriveners error."

67.     On August 21, 2017, the Company filed a quarterly report on Form 10-Q with the SEC announcing the Company's financial results for the second quarter ended June 30, 2017 (the "2017 2Q 10-Q). In the 2017 2Q 10-Q, the Company reiterated that it is subject to conditions which "raise substantial doubt about [the Company's] ability to continue as a going concern:

> Subject to the launch and ramp up of the additional pipeline of revenue streams, there is no certainty that we will be successful in generating sufficient cash flow from operations or achieving and maintaining profitable operations in the future to enable us to meet our obligations as they come due and consequently continue as a going concern. The Company may require additional funds to further develop our expanded business plan. The Company may require additional financing this year to fund our operations and is examining possible sources of funding beyond the existing cash generated from operations. Sales of additional equity securities would result in the dilution of the interests of existing stockholders. There can be no assurance that financing will be available when required. In the event that the necessary additional financing is not obtained, the Company would reduce its discretionary overhead costs substantially, or otherwise curtail operations.
>
> ***The Company expects the forgoing, or a combination thereof, to meet our anticipated cash requirements for the next 12 months; however, these conditions raise substantial doubt about our ability to continue as a going concern.*** The accompanying financial statements do not include any adjustments to reflect the possible future effects on recoverability and reclassification of assets or the amounts and classification of liabilities that may result from the outcome of this uncertainty.

(Emphasis added).

68.     Further, the 2017 2Q 10-Q disclosed the Securities Class Action and stated the following, in relevant part:

During the three and six months ended June 30, 2017, the Company learned that a class action complaint had been filed against the Company, its Chief Executive Officer and its Chief Financial Officer in the United States District Court for the District of New Jersey. The complaint alleges, inter alia, that defendants violated the federal securities laws by, among other things, failing to disclose that the Company was engaged in an unlawful scheme to promote its stock. Neither the Company nor the other defendants have yet been served with the complaint. ***The Company has analyzed the complaint and, based on that analysis, has concluded that the complaint is legally deficient and otherwise without merit. The Company intends to vigorously defend against these claims if the complaints are served upon it.***

(Emphasis added).

69.      The 2017 2Q 10-Q also summarized the related party transactions entered into between the Company and certain of the Company's directors and officers. The Company, once again, failed to disclose any substantive information, including the terms, of the following contractual arrangements:

**NOTE 9– RELATED PARTY TRANSACTIONS AND BALANCES**

During 2016, the Company paid an advance on behalf of certain shareholders in the amount of $250,000. These shareholders also serve as directors and officers of the Company. $120,000 was returned by December 31, 2016, and $50,000 was returned during the period ended June 30, 2017. The $80,000 is reflected in prepaids and other current assets as at June 30, 2017 (December 31, 2016 - $130,000).

The total amount owing to the same shareholders, in relation to the services they provide to the Company in their capacity as Officers at June 30, 2017 was $248,488 (December 31, 2016 - $186,818) which includes expense reimbursements. This amount is reflected in accounts payable and is further described below.

As at June 30, 2017, the Company had an amount owing to an entity owned and controlled by the Chief Executive Officer of the Company of $194,052 (December 31, 2016 - $127,073). The amount owing relates to services provided by the Chief Executive Officer and expense reimbursements.

As at June 30, 2017, the Company had an amount owing to an entity owned and controlled by the Secretary of the Company of $54,436 (December 31, 2016 - $59,745). The amount owing relates to services provided by the Secretary and expense reimbursements.

As at June 30, 2017, the Company had an amount owing to the President of the Company of $10,530 (December 31, 2016 - $28,092) for salary.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

As at June 30, 2017, the Company had an amount owing to an entity owned and controlled by the Chief Financial Officer of the Company of $5,394 (December 31, 2016 - $31,653). The amount owing relates to services provided by the Chief Financial Officer.

A total of $94,962 and $173,377 was recognized during the three and six month period ended June 30, 2017, respectively, for share-based payments expense to directors and officers of the Company.

As at June 30, 2017 and December 31, 2016, the amounts owing to officers of the Company are recorded in accounts payable and accrued liabilities.

70.     The 2017 2Q 10-Q states that as of June 30, 2017, the Company owed a total of $248,488 to its officers for services provided. Yet, as also listed above, a totaling of the individual amounts owed to Defendants Lee ($194,052), Yew ($54,436), Roberts ($10,530) and Morales ($5,394) equates to $264,412, a difference of $15,924. The Company has failed to provide an explanation for this discrepancy.

71.     In the SOX Certifications accompanying the 2017 2Q 10-Q, Defendants Lee and Morales each certified that they are "responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant to have:

a)      "Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared";

b)      "Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;" [and]

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

c) "Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation."

72. Further, the SOX certifications stated that Defendants Lee and Morales "have disclosed, based on [Defendants Lee and Morales'] most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

73. The statements in the preceding paragraphs were false and misleading because the Individual Defendants made and/or caused the Company to make false and misleading statements and/or failed to disclose that: (i) the Company engaged in an illegal stock promotion scheme which resulted in the artificial inflation of Zoompass shares; (ii) discovery of the foregoing conduct would subject Zoompass to potential criminal sanctions and heightened regulatory scrutiny; and (iii) as a result of the foregoing, the Company lacked adequate internal controls over financial reporting.

**DAMAGES TO ZOOMPASS CAUSED BY THE INDIVIDUAL DEFENDANTS**

74. As a direct and proximate result of the Individual Defendants' misconduct, the Individual Defendants allowed for materially inadequate controls over the Company's policies and practices, caused the company to issue materially false and misleading statements during the Relevant Period, and substantially damaged the Company's credibility, corporate image and goodwill.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

75.     Zoompass has expended and will continue to expend significant sums of money. Additional expenditures and damages that the Company has incurred as a result of the Individual Defendants' breaches of their fiduciary duty include:

        a.     Costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to Zoompass;

        b.     Costs and fees paid to stock promoters and other third-parties who assisted the Individual Defendants in engaging in the illicit stock promotion scheme;

        c.     Costs incurred from investigating, defending and paying any settlement or judgment in connection with the Securities Class Action for violations of federal securities laws and governing accounting principles; and

        d.     Costs incurred from the loss of Zoompass's customers' confidence in the Company's services.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

76.     Plaintiff brings this action derivatively in the right and for the benefit of Zoompass to redress injuries suffered, and to be suffered, by Zoompass as a direct result of the Individual Defendants' multiple breaches of fiduciary duty.

77.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

78.     Zoompass is named as a nominal defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have. Plaintiff is and was a shareholder of Zoompass at the time of the transgressions complained of. Plaintiff will adequately and fairly represent the interests of Zoompass and its shareholders in enforcing and prosecuting their rights. Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

79.     The wrongful acts complained of herein subject, and will continue to subject, Zoompass to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

80.     The wrongful acts complained of herein were unlawfully concealed from Zoompass's shareholders.

81.     Throughout the Relevant Period, the Individual Defendants violated multiple corporate governance principles, thus representing evidence of the Individual Defendants' breaches of fiduciary duties.  The course of action related to misrepresenting and/or concealing the following: (i) that Zoompass engaged in and/or was engaging in an illegal stock promotion scheme which resulted in the artificial inflation of Zoompass shares; (ii) that discovery of the foregoing conduct would subject Zoompass to potential criminal sanctions and heightened regulatory scrutiny; and (iii) the Company lacked adequate internal controls over financial reporting.

82.     As a result of the facts set forth herein, Plaintiff has not made any demand on the Current Director Defendants to institute this action since such demand would be a futile and useless act because the Current Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action. The wrongful acts complained of herein show a wholesale abandonment by the Individual Defendants, including the Current Director Defendants, of their fiduciary duties of loyalty, due care and oversight

83.     At the time this action was initiated, the Board was comprised of four directors: Defendants Lee, Roberts, Yew and Tondeur.  Plaintiff did not make a demand on the Board to institute this action because such a demand would have been a futile, wasteful and useless act.

84.     Demand upon the Current Director Defendants is futile because a majority of the Board is already predisposed to refuse a demand as demonstrated by the Current Director Defendants' position on the merits of the allegations set forth in the GeoInvesting reports, whose allegations also form the basis, in part, of the liability of the Current Director Defendants in the Securities Class Actions and the instant litigation.  In a Form 8-K filed by the Company on August 23, 2017, the Company stated the following, in relevant part:

> On August 22, 2017, Zoompass Holdings, Inc. (the " Company") learned that an Affidavit of Service averring service of a Summons in a Civil Case and Complaint for Violation of Federal Securities Laws on the Company had been filed the previous day in the United States District Court for the District of New Jersey in the matter entitled Naymish Patel, Individually and on behalf of all others similarly situated, v. Zoompass

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Holdings, Inc., Robert Lee and Brian Morales. The complaint in this matter alleges, *inter alia*, that defendants violated the federal securities laws by, among other things, failing to disclose that the Company was engaged in an alleged unlawful scheme to promote its stock. ***The Company has analyzed the complaint and, based on that analysis has concluded that the complaint is legally deficient and otherwise without merit. The Company intends to vigorously defend against these claims.***

(Emphasis added).

85.     Thus, because the Current Director Defendants have already determined that they believe that the allegations in the Seeking Alpha Article and consequently, the Securities Class Action, are without merit, and because the instant action is substantially based on the same and/or similar misconduct as the Securities Class Action, the Current Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this derivative action.

86.     Further, a majority of the Current Director Defendants are not independent or disinterested, thus rendering demand upon them futile.

87.     In the 2016 10-K, the Company stated that "[o]nly Mr. Jon Tondeur was deemed to be an 'independent director,' as that term is defined by the listing standards of the national exchanges and SEC rules."   Thus, as admitted by the Company, Defendants Lee, Roberts and Yew lack independence, rendering demand upon them as futile.

88.     Further reason that demand would be futile with respect to Defendants Lee and Yew is because they engaged in self-dealing.  As discussed above, effective August 22, 2016, the Company assumed agreements that covers fees paid to companies owned and controlled by Defendants Lee and Yew. Lee and Yew, who, collectively, beneficially own 50.3% of the Company's outstanding shares, are significant shareholders of the Company.  Further, given that Lee and Yew are members of the Board and thus, are responsible for reviewing and approving all related party transactions, including the foregoing agreements between themselves and the Company, they are conflicted and are unable to independently and/or disinterestedly consider a demand challenging the fairness of the agreements.

89.     With respect to Defendant Lee, Lee is currently the CEO and a director of Zoompass. Further, through his beneficial ownership of 38.1% of the Company's issued and outstanding

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

common shares as of April 18, 2017, worth approximately $31,333,976 based on the closing price of Zoompass shares on April 18, 2017.  Accordingly, Lee is a significant shareholder of the Company. As conceded by the Company in the 2016 10-K, Lee, as a member of senior management of Zoompass and a significant shareholder, is not an independent director due to his insider status.  Additionally, as demonstrated above, Lee has repeatedly made and/or caused the Company to issue false and misleading statements and omissions to the public regarding the Company's, and the Individual Defendants', lack of involvement in the illicit stock promotion scheme.  Further, he is a named defendant in the Securities Class Action and therefore faces a substantial likelihood of liability, rendering him incapable of independently exercising his business judgment and demand futile.

90.     Additionally, as discussed above, pursuant to the 2016 10-K, "[e]ffective August 22, 2016, the [Company] assumed an agreement that covers fees paid to a company owned and controlled by Rob Lee.  The agreement calls for payment of Cdn$22,000 [USD $18,040] per month plus the reimbursement of expenses incurred on the Company's behalf.  As at December 31, 2016, the fees noted above remain unpaid."  As stated in the 2017 2Q 10-Q, as of June 30, 2017, the Company had an amount owing to an entity owned and controlled by Defendant Lee in the amount of $194,052, relating to services provided by Defendant Lee and expense reimbursements.  To date, the Company, including the Individual Defendants, have never provided any additional information about the foregoing contractual arrangement with the entity owned by Defendant Lee in order to determine whether the terms of the agreements were entirely fair to Zoompass and the minority shareholders.

91.     As previously discussed, in November 2016, the Company's Board of Directors approved and the majority of shareholders consented to the adoption of an equity based compensation plan.  On December 1, 2016, Zoompass issued 1,480,000 common stock purchase options at an exercise price of CAD $1.50 (approximately $1.23 USD) to the Company's directors, officers, employees and consultants.  Of the 1,480,000 common stock purchase options, 562,500 vested immediately and are exercisable for five years from the grant date, and 917,500 of the options are exercisable for five years from the grant date and vest ratably over a three-year period from the date

of grant. As of December 31, 2016, Defendant Lee was awarded 537,500 stock options, 197,222 of which were exercisable as of that date.

92.     Additionally, on December 1, 2016, Lee also was awarded 162,500 deferred stock units, which is defined in the Company's 2016 Stock Incentive Plan as "an Award which may be earned in whole or in part upon the passage of time or the attainment of performance criteria established by the Administrator and which after election by the Grantee, may be settled for cash, Shares or other securities or a combination of cash, Shares or other securities as established by the Administrator and at the Company's sole discretion."

93.     Given the Company's precarious financial condition, inability to make a profit since inception and its negative operating cash flow, coupled with the fact that the majority of Lee's compensation was comprised of equity compensation and that he is a significant shareholder of the Company, Lee had a financial motive to keep the Company's stock price as high as possible so that he could profit from his significant equity holdings. As such, Lee is not disinterested or independent and accordingly, demand upon Lee is excused.

94.     With respect to Defendant Roberts, Roberts serves as the President of the Company and as a director. Further, as of April 18, 2017, Roberts was the beneficial owner of 1.4% of the Company's issued and outstanding common stock, worth approximately $1,183,463 based on the closing price of Zoompass shares on April 18, 2017. As conceded by the Company in the 2016 10-K, Roberts, as a member of senior management of Zoompass, is not an independent director due to his insider status. Additionally, as demonstrated above, Roberts has repeatedly made and/or caused the Company to issue false and misleading statements and omissions to the public regarding the Company's, and the Individual Defendants', lack of involvement in the illicit stock promotion scheme. Accordingly, he faces a substantial likelihood of liability thus rendering demand upon him as futile.

95.     As discussed above, as of December 31, 2016, Defendant Roberts was awarded 537,500 stock options, 197,222 of which were exercisable as of that date, and 162,500 deferred stock units, 65,278 of which were immediately exercisable as of that date. Given the Company's precarious

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

financial condition, inability to make a profit since inception and its negative operating cash flow, coupled with the fact that the majority of Roberts' compensation was comprised of equity compensation and that he is the beneficial owner of 1.4% of the Company's outstanding common stock, Roberts had a financial motive to keep the Company's stock price as high as possible so that he could profit from his significant equity holdings. As such, Roberts is not disinterested or independent and accordingly, demand upon Roberts is excused.

96. With respect to Defendant Yew, Yew serves as Secretary and a director of Zoompass. As conceded by the Company in the 2016 10-K, Yew, as a member of senior management of Zoompass, is not an independent director due to his insider status. Additionally, as demonstrated above, Yew has repeatedly made and/or caused the Company to issue false and misleading statements and omissions to the public regarding the Company's, and the Individual Defendants', lack of involvement in the illicit stock promotion scheme. Accordingly, he faces a substantial likelihood of liability thus rendering demand upon him as futile.

97. Additionally, as discussed above, pursuant to the 2016 10-K, "[e]ffective August 22, 2016, the [Company] assumed an agreement that covers fees paid to a company owned and controlled by Edward Yew. The agreement calls for payment of $14,000 per month plus the reimbursement of expenses incurred on the Company's behalf. Fees to this Company were ceased on October 1, 2016. As at December 31, 2016, the fees above remain unpaid." Additionally, pursuant to the 2017 2Q 10-Q, as of June 30, 2017, the Company had an amount owing to a company owned and controlled by Defendant Yew of $54,436, which relates to services provided and expense reimbursements. To date, the Company, including the Individual Defendants, have never provided any additional information about the foregoing contractual arrangement with the entity owned by Defendant Yew in order to determine whether the terms of the agreement were entirely fair to Zoompass and the minority shareholders.

98. Further, as of April 18, 2017, Yew was the beneficial owner of 12.2% of the Company's issued and outstanding common stock, worth approximately $10,044,553 based on the closing price of Zoompass shares on April 18, 2017. Thus, Yew is a significant shareholder of

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Zoompass. Given the Company's precarious financial condition, inability to make a profit since inception and its negative operating cash flow, coupled with the fact that Yew is a significant shareholder of the Company, Yew had a financial motive to keep the Company's stock price as high as possible so that he could profit from his significant equity holdings. As such, Yew is not disinterested or independent and accordingly, demand upon Yew is excused.

99. With respect to Defendant Tondeur, as a director of Zoompass, Tondeur has repeatedly made and/or caused the Company to issue false and misleading statements and omissions to the public regarding the Company's and the Individual Defendants' lack of involvement in the illicit stock promotion scheme. Accordingly, he faces a substantial likelihood of liability thus rendering demand upon him as futile.

100. Further, as of December 31, 2016, Defendant Tondeur was awarded 187,500 stock options, all of which were exercisable as of that date, and 62,500 deferred stock units, all of which of which were immediately exercisable as of that date. Additionally, on November 30, 2016, the Company issued 400,000 common share purchase warrants to Tondeur with an exercise price of CAD $0.50 (approximately USD $0.40), each of which is exercisable into one share of the Company's common stock until October 31, 2017. Additionally, as of April 18, 2017, Tondeur was the beneficial owner of 3.2% of the Company's issued and outstanding common stock, worth approximately $2,636,797 based on the closing price of Zoompass shares on April 18, 2017.

101. Given the Company's precarious financial condition, inability to make a profit since inception and its negative operating cash flow, coupled with the fact that the majority of Tondeur's compensation was comprised of equity compensation and that he is a significant shareholder of the Company, Tondeur had a financial motive to keep the Company's stock price as high as possible so that he could profit from his significant equity holdings. As such, Tondeur is not disinterested or independent and accordingly, demand upon Tondeur is excused.

102. Based on the foregoing and as set forth in the Company's 2016 10-K, as of April 18, 2017, the Current Director Defendants were the beneficial owners of more than 54% of the

1   Company's outstanding common stock and thus, are controlling shareholders of the Company[6].

2   Further, given that the Current Director Defendants exercise control over all aspects of the Company,

3   including but not limited to, the amount of compensation to be awarded to the Company's directors

4   and officers, including themselves, they are conflicted and are incapable of impartially considering a

5   demand challenging the amount of compensation awarded to themselves.

6       103.   Additionally, given the Company's admission in the 2016 10-K that the entire Board

7   is responsible for risk oversight in multiple areas, it can be reasonably inferred that the Current

8   Director Defendants approved and/or were aware of the illicit stock promotion scheme and, in breach

9   of their fiduciary duties, falsely misrepresented and/or concealed the Company's involvement in

10   and/or knowledge of the foregoing to the investing public.

11      104.   The Individual Defendants' conduct described herein and summarized above

12   demonstrates a pattern of misconduct that could not have been the product of legitimate business

13   judgment as it was based on intentional, reckless, and disloyal misconduct.  As a majority of the

14   Individual Defendants faces a substantial likelihood of liability, they are self-interested in the

15   transactions challenged herein and cannot be presumed to be capable of exercising independent and

16   disinterested judgment about whether to pursue this action on behalf of the shareholders of the

17   Company.

18      105.   Based on the foregoing, the Current Director Defendants face a sufficiently

19   substantial likelihood of liability and accordingly, there is a reasonable doubt as to each Defendant's

20   disinterestedness in deciding whether pursuing legal action would be in the Company's best interest.

21   Accordingly, demand upon the Current Director Defendants is excused as being futile.

22                           **CAUSES OF ACTION**

23                               **COUNT I**

24      **(Against The Individual Defendants for Breach  of Fiduciary Duty)**

25      106.   Plaintiff incorporates by reference and realleges each of the foregoing allegations  as

26   though fully set forth herein.

27   _____
     [6] According to the 2016 10-K, the Individual Defendants are the beneficial owners of 62.7% of the
28   Company's outstanding common stock.

                                   48
                 **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

107.    The Individual Defendants owed and owe Zoompass fiduciary obligations, including the obligations of good faith, fair dealing, loyalty and care. Among other things, the Individual Defendants were and are required to act in furtherance of the best interests of Zoompass and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Zoompass and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company's affairs and in the use and preservation of its property and assets, and the highest obligations of fair dealing. The Individual Defendants breached their fiduciary duties by:

    a)    Misrepresenting and/or concealing that the Company was engaged in an illegal stock promotion scheme which resulted in the artificial inflation of Zoompass shares;

    b)    Misrepresenting and/or concealing the terms of certain contractual arrangements between the Company and entities owned and/or controlled by certain of the Individual Defendants, all of which were approved by the Individual Defendants;

    c)    Failing to maintain an effective system of internal controls over financial reporting; and

    d)    Improperly awarding themselves excessive and unauthorized compensation.

108.    By reason of the foregoing, Zoompass was damaged.

## COUNT II

**(Against the Individual Defendants for Waste of Corporate Assets)**

109.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

110.    Defendants breached their fiduciary duties by failing to properly supervise and monitor Zoompass and by allowing the Company to engage in an illegal, unethical and improper course of conduct.

111.    As a result of the Individual Defendants' illicit course of conduct and breaches of

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

fiduciary duty, Zoompass has wasted valuable corporate assets through payments of compensation to themselves and to entities owned and/or controlled by certain of the Individual Defendants because the Company has incurred and will continue to incur significant potential liability for legal costs, penalties, fines and/or other legal fees in connection with the defense of the Individual Defendants' unlawful course of conduct complained of herein.

112.   As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

113.   By reason of the foregoing, Zoompass was damaged.

## COUNT III

### (Against the Individual Defendants for Unjust Enrichment)

114.   Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

115.   Through the wrongful course of conduct and actions complained of herein, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of Zoompass. The wrongful conduct was continuous and resulted in ongoing harm to the Company.   The Individual Defendants were unjustly enriched pursuant to receiving compensation and/or remuneration while breaching their fiduciary duties to the Company, as alleged herein.

116.   Plaintiff, as a shareholder of Zoompass, seeks restitution from the Individual Defendants, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, from their wrongful course of conduct and fiduciary breaches.

117.   By reason of the foregoing, Zoompass was damaged.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Directing Defendants to account to Zoompass for all damages sustained   or to be sustained by the Company by reason of the wrongs alleged herein;

B.   Directing Zoompass to take all necessary actions to reform its corporate governance

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

and internal procedures to comply with applicable laws and protect the Company and its shareholders from a recurrence of the events described herein, including, but not limited to, directing the Company to implement a Code of Conduct and Ethics, undertake a shareholder vote resolution for amendments to Zoompass's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote on corporate governance policies;

C.     Awarding to Zoompass restitution from the Defendants and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants.

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

E.     Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: October 4, 2017

**ALBRIGHT, STODDARD, WARNICK & ALBRIGHT**

*/s/ G. Mark Albright*
G.  Mark Albright, Nevada Bar No. 1394
801 S. Rancho Dr., Suite D4
Las Vegas, NV 89106
Telephone: (702) 384-7111
Facsimile: (702) 384-0605
E-mail: gma@albrightstoddard.com

**FARUQI & FARUQI, LLP**
Stuart J. Guber (*pro hac vice forthcoming*)
101 Greenwood Avenue, Suite 600
Jenkintown, PA 19046
Telephone: 215-277-5770
Facsimile: 215-277-5771
Email: sguber@faruqilaw.com

Nina M. Varindani (*pro hac vice forthcoming*)
685 Third Avenue, 26th Floor
New York, New York 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: nvarindani@faruqilaw.com

*Attorneys for Plaintiff*

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1

## RULE 23.1 VERIFICATION

2     I, Valerie Kluge, hereby verify that I am a shareholder of Zoompass Holdings, Inc. (the

3  "Company"), and am ready, willing, and able to pursue this action in the hope of improving the

4  Company and recovering damages for the Company caused by the defendants' conduct.  I have

5  reviewed the allegations made in this Verified Shareholder Derivative Complaint (the "Complaint")

6  and to those allegations of which I have personal knowledge, I believe those allegations to be true.

7  As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their

8  investigation and believe them to be true. Having received a copy of this Complaint, having

9  reviewed it with my counsel, I hereby authorize its filing.

10     I hereby declare under penalty of perjury under the laws of the United States of America that

11  the foregoing is true and correct. Executed this 28 day of September, 2017.

12

13

14                                              Valerie Kluge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

52

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**